IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JEREMY TIMKO,** | : CIVIL ACTION NO. 4:22-CV-1195 |
| Plaintiff | : (Judge Conner) |
| v. | : |
| **SCOTT TRAUGH,** **MICHAEL VANDINE, and** **HEMLOCK TOWNSHIP,** | : |
| Defendants | : |

## MEMORANDUM

Plaintiff Jeremy Timko brings this lawsuit against Hemlock Township, the township's Chief of Police, Michael VanDine, and Police Officer Scott Traugh for excessive force, disability discrimination, and related state-law claims. Timko's claims arise out of Officer Traugh's repeated use of a taser against him while he was recovering from an epileptic seizure that caused him to crash his electric scooter. Defendants move for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). We will grant in part and deny in part defendants' motion.

**I.    Factual Background & Procedural History**

   **A.    Timko's Medical Condition**

Timko is a 48-year-old resident of Hemlock Township, Pennsylvania, who suffers from epilepsy disorder. (See Doc. 1 ¶¶ 8, 9). Due to his medical condition, Timko is prone to epileptic seizures that sometimes cause him to lose consciousness for several minutes before waking up "lethargic and confused." (See id. ¶ 11). He cannot obtain a driver's license or drive a car, and primarily gets around "by foot,

electric bike, or electric scooter." (See id. ¶¶ 12, 13). Members of the Hemlock Township Police Department, including Officer Traugh and Chief VanDine, purportedly were well-aware of Timko's medical condition before the events that form the basis for this complaint. (See id. ¶¶ 17, 18; see also id. ¶ 19).

    **B.    Timko's Seizure, Crash, and Tasing**

On the afternoon of July 13, 2022, Timko experienced an epileptic seizure while riding his electric scooter down Bloom Street in Hemlock Township. (See id. ¶¶ 14, 16). The seizure caused Timko to crash his scooter and lose consciousness. (See id. ¶ 16). Officer Traugh and two emergency medical technicians ("EMTs") from the Bloomsburg Volunteer Ambulance Association were sent to the scene in response to the crash. (See id. ¶ 20). Timko claims his first recollection upon regaining consciousness was that Officer Traugh began tasing him with thousands of volts of electricity. (See id. ¶¶ 21, 23). As Timko rolled onto his back, raised his knees to his chest, and cried out in pain, Officer Traugh allegedly yelled, "[D]o you want another one? Do you want another one?" (See id. ¶¶ 24, 25). Timko then attempted to stand up while writhing in agony, prompting Officer Traugh to yell at him to stay on the ground. (See id. ¶ 26). Timko claims Officer Traugh tased him a total of six times "for no legitimate reason"; he was not under arrest and his seizure and subsequent actions never posed a threat to officer safety, the EMTs, or the public at-large. (See id. ¶¶ 22, 27, 28, 30). The two volunteer EMTs at the scene purportedly were "disgusted with Officer Traugh's conduct." (See id. ¶ 29).

### C. Police Comments and Timko's Hospitalization

Timko was escorted to an ambulance due to the serious injuries he suffered while being tased. (See id. ¶¶ 31, 42). Chief VanDine arrived at the scene, approached Timko in the ambulance, and allegedly stated that "Officer Traugh 'had' to tase him six times to get him 'under control.'" (See id. ¶¶ 32, 33). Timko's father, Robert Timko, heard about the incident and came to collect Timko's personal items and scooter. (See id. ¶¶ 35, 37). Robert Timko spoke with Officer Traugh, who allegedly said that he was aware of Timko's medical history and susceptibility to epileptic seizures but he "couldn't control" him on this occasion. (See id. ¶¶ 36-40). Timko subsequently was transported to two different hospitals for medical evaluation and treatment; at the second hospital, Timko's father found two taser prongs still lodged in Timko's skin. (See id. ¶¶ 34, 41). Timko claims he suffered serious injuries and damages because of Officer Traugh's conduct. (See id. ¶ 42).

### D. Procedural History

Timko filed his complaint on August 5, 2022. He raises the following seven claims: excessive force against Officer Traugh, Hemlock Township, and Chief VanDine pursuant to 42 U.S.C. § 1983 (Counts I through III, respectively); disability discrimination against Hemlock Township pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Rehabilitation Act, 29 U.S.C. § 701 et seq. (Counts IV and V, respectively); and state-law claims of assault and battery against Officer Traugh (Counts VI and VII). Timko seeks compensatory damages against all defendants and punitive damages against Officer Traugh and

3

Chief VanDine.  Defendants move for partial judgment on the pleadings on Counts I, III, VI and VII and argue that Timko's requests for punitive damages should be dismissed.[1]  The motion is fully briefed and ripe for disposition.

## II.     Legal Standard

A motion for judgment on the pleadings is the procedural hybrid of a motion to dismiss and a motion for summary judgment.  See Westport Ins. Corp. v. Black, Davis & Shue Agency, Inc., 513 F. Supp. 2d 157, 162 (M.D. Pa. 2007).  Rule 12(c) of the Federal Rules of Civil Procedure provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  FED. R. CIV. P. 12(c).  To succeed on a Rule 12(c) motion, the movant must clearly establish that no material issue of fact remains to be resolved and that the movant "is entitled to judgment as a matter of law."  Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 220 (3d Cir. 2005); see 5C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1368 (3d ed. 2015).  A Rule 12(c) motion for judgment on the pleadings is decided under a standard similar to a Rule 12(b)(6) motion to dismiss.  See Zimmerman v. Corbett, 873 F.3d 414, 417 (3d Cir. 2017).  That is, judgment on the pleadings should be granted only when, accepting as true the facts alleged by the nonmovant and drawing "all reasonable inferences" in that party's

---

[1] Defendants' motion and supporting brief do not identify Timko's claims by count, but the introductory section of their brief titled "Issues for Consideration and Suggested Answers" addresses only the substantive claims against Officer Traugh and Chief VanDine.  (See Doc. 16 at 1-2; see also Doc. 15 ¶ 3; Doc. 24).  Defendants cite no authority in challenging the substantive claims against Hemlock township (Counts II, IV, and V).  We therefore need not address the substantive viability of these claims.

4

favor, the movant is entitled to judgment as a matter of law. See id. (citation omitted).

## III. Discussion

Defendants challenge the sufficiency of the pleadings against Officer Traugh and Chief VanDine. They claim that Officer Traugh justifiably used force against Timko and, separately, that Chief VanDine cannot be held liable for Officer Traugh's actions. Officer Traugh and Chief VanDine also raise a qualified immunity defense. We begin with Timko's Section 1983 claims.

### A. Federal Constitutional Claims

Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. See 42 U.S.C. § 1983. The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under Section 1983, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." See Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Defendants concede they are state actors. (See Doc. 16 at 6). Timko claims Officer Traugh used excessive force against him thereby violating his Fourth and Fourteenth Amendment rights to be free from an unreasonable seizure. (See Doc. 1 ¶¶ 44, 47). He further claims that Chief VanDine acquiesced in, approved, and ratified Officer's Traugh's use of excessive force. (See id. ¶¶ 61-73). Defendants

5

raise a qualified immunity defense and dispute that Officer Traugh engaged in any wrongdoing. (See Doc. 16 at 1-2).

Qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted. Pearson v. Callahan, 555 U.S. 223, 244-45 (2009). No liability will attach if a reasonable actor could have believed the challenged conduct complied with settled law. See id. at 244; see also Springer v. Henry, 435 F.3d 268, 280 (3d Cir. 2006). The burden to establish qualified immunity rests with the defendant claiming its protection. See Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001). A defendant's entitlement to immunity must be "established on the face of the complaint." Thomas v. Independence Township, 463 F.3d 285, 291 (3d Cir. 2006) (quoting Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001)). Qualified immunity is more than "a mere defense to liability"; properly invoked, it shields a government official from suit entirely. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted). For that reason, immunity questions should be resolved "at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (citations omitted). Nonetheless, our court of appeals has cautioned against "venturing into a qualified immunity analysis at the pleading stage" in most cases given the need for

a developed factual record.  See Newland v. Reehorst, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) (*per curiam*) (nonprecedential).[2]

A court evaluating a claim of qualified immunity considers two distinct inquiries: whether, viewing the facts alleged in a light most favorable to the plaintiff, a defendant violated a constitutional right and, if so, whether that right was "clearly established" at the time of the alleged violation.  See Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232).  A court may begin its analysis with either prong.  See Pearson, 555 U.S. at 236.  Defendants base their qualified immunity defense entirely upon the first prong, (see Doc. 16 at 13-16), so we begin and end our analysis there for each defendant.

  1.  *Excessive Use of Force (Count I)*

Timko claims Officer Traugh used excessive force by tasing him six times after he suffered a medical emergency, violating his Fourth Amendment rights.  Courts evaluate Fourth Amendment excessive force claims under an "objective reasonableness" standard.  See Graham v. Connor, 490 U.S. 386, 388, 397 (1989); Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004) (quoting Graham, 490 U.S. at 396-97).  Whether a particular use of force is "reasonable" depends upon the facts of each case, "including the severity of the crime at issue, whether the suspect poses

---

[2] The court acknowledges that nonprecedential decisions are not binding upon federal district courts.  However, we cite these nonprecedential decisions because we have carefully considered each decision and we are persuaded by each panel's *ratio decidendi*.

an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)). Other relevant factors include whether

> the physical force applied was of such an extent as to lead to injury[,] the possibility that the persons subject to police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

See Estate of Smith v. Marasco, 430 F.3d 140, 149-50 (3d Cir. 2005) (quoting Sharrar v. Felsing, 128 F.3d 810, 821-22 (3d Cir. 1997), abrogated on other grounds by Curley v. Klem, 499 F.3d 199, 209-11 (3d Cir. 2007)).

Timko has sufficiently alleged that Officer Traugh violated his Fourth Amendment rights. Timko alleges that he was suffering from a medical condition on July 13, 2022, that Officer Traugh was familiar with his condition, and that he did not pose a danger to the police, the EMTs, or the public-at-large. (See Doc. 1 ¶¶ 17-22, 30). Timko also alleges he was not under arrest, Officer Traugh had no reason to suspect he was armed or dangerous, and there were no other suspects to contend with at the time. (See id. ¶¶ 14-16, 22, 27-30). Defendants emphasize that Timko admits he "attempt[ed] to stand up" after Officer Traugh ordered him to stay on the ground, thus justifying the use of force. (See Doc. 16 at 15 (quoting Doc. 1 ¶ 26)). But such "resistance" must be evaluated in light of Officer Traugh's purported knowledge of Timko's medical condition and the apparent lack of any danger or need to arrest Timko. (See Doc. 1 ¶¶ 17-19, 22, 30, 39, 40). Under these

8

circumstances, Timko avers that Officer Traugh had no legitimate reason to tase him *six* times.  (See id. ¶¶ 27, 28).

We find that the relevant factors weigh in favor of Timko at this procedural juncture.  See Estate of Smith, 430 F.3d at 149-50; Anthony v. Seltzer, 696 F. App'x 79, 82-83 (3d Cir. 2017) (nonprecedential) (denying officers qualified immunity for allegedly tasing plaintiff who was suffering from a seizure *after* plaintiff was subdued, compliant, and no longer a threat).  The complaint sufficiently alleges Officer Traugh violated Timko's constitutional rights by using objectively unreasonable force against him.  Defendants fail to challenge whether the right at issue was clearly established;[3] we therefore deny Officer Traugh's invocation of qualified immunity without prejudice to his right to reraise this defense at a later stage in the litigation.  We will deny defendants' motion for judgment on the pleadings as to Count I.

---

[3] It is defendants' burden to establish that qualified immunity applies.  See Beers-Capitol, 256 F.3d at 142 n.15 (citing Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989)).  Defendants have failed to meaningfully develop their qualified immunity argument with respect to whether Officer Traugh's conduct violated clearly established law.  Nevertheless, we find that tasing an individual who is experiencing an epileptic seizure and is not posing a threat to others violated clearly established law at the time of Officer Traugh's conduct.  See Anthony, 696 F. App'x at 82-83 (tasing "unthreatening and subdued individual suffering a seizure" violated clearly established law in 2013); Helm v. Rainbow City, 989 F.3d 1265, 1276 (11th Cir. 2021) (tasing individual three times who was not committing a crime, suffering a grand mal seizure, and not posing a threat violates clearly established law) (citations omitted); Dorsey v. Sokoloff, 381 F. Supp. 3d 521, 534 (D. Md. 2019) (tasing unarmed suspect six times while he "writhe[d] on the ground" from grand mal seizure was "unnecessary, gratuitous, and disproportionate" and violated clearly established law) (citing Meyers v. Baltimore County, 713 F.3d 723, 733-35 (4th Cir. 2013)).

### 2. *Supervisory Liability (Count III)*

Timko also brings a claim against Officer Traugh's supervisor, Chief VanDine, based on Officer Traugh's conduct. To hold a supervisor liable under Section 1983, a plaintiff must allege that the defendant is a policymaker who acted with deliberate indifference towards his constitutional rights, or that the defendant "participated in violating [his] rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." See A.M. *ex rel.* J.M.K. v. Luzerne Cnty. Juv. Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (citing Stoneking, 882 F.2d at 725; Baker v. Monroe Township, 50 F.3d 1186, 1190-91 (3d Cir. 1995)). In the matter *sub judice*, Timko's claim is solely premised on the latter theory—that Chief VanDine had knowledge of and acquiesced in Officer Traugh's constitutional violations. (See Doc. 1 ¶¶ 32-33, 61-67; Doc. 23 at 14). Under this theory of liability, actual knowledge may "be inferred from circumstances other than actual sight," see Baker, 50 F.3d at 1194, such as "knowledge of a prior pattern of similar incidents," see Colburn v. Upper Darby Township, 838 F.2d 663, 673 (3d Cir. 1988). Acquiescence occurs when "a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so." See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997). A supervisor cannot, however, be held liable merely on a theory of *respondeat superior*. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted).

Defendants argue Chief VanDine is entitled to qualified immunity and deny that he participated in the alleged constitutional violation. (See Doc. 24 at 5). We

10

agree. Timko does not allege Chief VanDine had contemporaneous knowledge that Officer Traugh was going to tase Timko. (See Doc. 1 ¶¶ 32, 33). His conclusory allegation that Chief VanDine approved of taser use in the past, (see id. ¶ 72), does not provide the specificity necessary to plausibly allege that Chief VanDine was aware of a pattern of similar incidents. See Colburn, 838 F.2d at 673; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). We also decline Timko's request to transform Chief VanDine's lone after-the-fact statement into a township policy, practice, or custom. (See Doc. 1 ¶ 65; see also id. ¶ 33). Timko has thus failed to allege that Chief VanDine tacitly approved or had actual knowledge of Officer Traugh's alleged constitutional violation.

Assuming *arguendo* that Chief VanDine tacitly approved of Officer Traugh's conduct, Timko nevertheless has failed to plead that Chief VanDine acquiesced in Officer Traugh's behavior. Timko merely alleges Chief VanDine made one statement—after the alleged constitutional violation occurred—about Officer Traugh's need to get Timko "under control." (See id. ¶ 33). Timko does not claim Chief VanDine refused any of his requests or exacerbated or prolonged his constitutional injury in any way. See Powell v. Wetzel, No. 1:12-CV-1684, 2014 WL 2864686, at *3 (M.D. Pa. June 24, 2014) (finding allegation that supervisor refused prisoner's requests to return wrongfully confiscated legal materials sufficient to plausibly allege supervisory liability). Assuming Chief VanDine made this *post hoc* singular statement to Timko, it is not enough to support an allegation of personal involvement or acquiescence in the underlying unconstitutional conduct. See Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (*per curiam*) (nonprecedential);

11

Bailey v. Wetzel, No. 2:21-CV-179, 2021 WL 5280926, at *5 (W.D. Pa. Nov. 12, 2021) (citations omitted); cf. Mack v. Warden Loretto FCI, 839 F.3d 286, 295 (3d Cir. 2016) (Bivens context).

Timko has failed to plausibly allege that Chief VanDine is liable as a supervisor for Officer Traugh's purported use of excessive force. Chief VanDine is entitled to qualified immunity, see Spady, 800 F.3d at 637, and we will grant defendants' motion for judgment on the pleadings as to Count III.

### B. State-Law Claims (Counts VI and VII)

Defendants broadly assert in the qualified-immunity section of their brief that "there is no pleading here that shows any wrongdoing on the part of Sgt. Traugh as far as any of the taser use." (See Doc. 16 at 16). But defendants cite no authority or set forth any argument in their motion or brief directly challenging Timko's allegations of assault and battery against Officer Traugh under Pennsylvania law. (See generally Docs. 15, 16, 24). We "summarily reject [these] undeveloped argument[s]." See United States v. Rossi, No. 20-3182, 2021 WL 4305021, at *8 (3d Cir. Sept. 22, 2021) (nonprecedential), cert. denied, 142 S. Ct. 616 (2021); accord Yentzer v. Potter County, No. 3:20-CV-1579, 2022 WL 903937, at *5 (M.D. Pa. Mar. 28, 2022) (Conner, J.) (rejecting, as an initial matter, "defendants' argument as conclusory and undeveloped"). We will deny defendants' motion to the extent they request judgment as to Counts VI and VII.

### C. Punitive Damages

Timko seeks punitive damages from Officer Traugh on Counts I, VI, and VII and from Chief VanDine on Count III. In a Section 1983 action, punitive damages

may be available against officials in their individual capacity "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Alexander v. Riga, 208 F.3d 419, 430-31 (3d Cir. 2000) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). Punitive damages are also available under Pennsylvania law when a defendant acts with "evil motive or [a] reckless indifference to the rights of others." See Hutchison *ex rel.* Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005) (quoting Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984)). The actor's state of mind "is vital," and their conduct must be "intentional, reckless, or malicious." See id. (quoting Feld, 485 A.2d at 748).

As the result of our dismissal of Count III, the request for punitive damages from Chief VanDine is moot. But Timko has sufficiently alleged that Officer Traugh intentionally and recklessly violated his rights under both federal and state law by unreasonably using force against him while he recovered from an epileptic seizure and posed no threat to others. (See Doc. 1 ¶¶ 23-30). These allegations provide a basis for punitive damages at this procedural juncture. We will grant defendants' request as to Chief VanDine but reject their efforts to jettison Timko's demand for punitive damages from Officer Traugh on Counts I, VI, and VII.

### D. Leave to Amend

Courts must generally grant leave to amend before dismissing a civil rights' claim if a curative amendment is conceivable. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002). The deficiencies regarding Count III identified

herein are factual and thus potentially curable.  Accordingly, we will grant Timko leave to amend Count III of the complaint.

## IV. Conclusion

We will grant in part and deny in part defendants' motion (Doc. 15) for judgment on the pleadings.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    December 29, 2023